# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
### No. 21-1976V

|  |  |
|---|---|
| FREDERICK SOFEN,<br><br>          Petitioner,<br><br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>          Respondent. | Chief Special Master Corcoran<br><br>Filed: May 12, 2026 |

*Leah VaSahnja Durant, Law Offices of Leah V. Durant, PLLC, Washington, DC, for Petitioner.*

*Lauren Kells, U.S. Department of Justice, Washington, DC, for Respondent.*

### RULING ON ENTITLEMENT AND DECISION AWARDING DAMAGES[1]

On October 7, 2021, Frederick Sofen filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"), alleging a Table injury – Shoulder Injury Related to Vaccine Administration ("SIRVA") – as a result of his receipt of an influenza ("flu") vaccine on October 29, 2020. Petition, ECF No. 1. The case was assigned to the Special Processing Unit of the Office of Special Masters (the "SPU").

For the reasons set forth below, and after holding a brief hearing on entitlement and damages in this matter, I find that Petitioner is entitled to compensation, and I award

---

[1] Because this Decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). This means the Decision will be available to anyone with access to the internet. In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

damages in the total amount of **$135,082.01, representing Petitioner's actual pain and suffering plus payment of his outstanding Medicaid lien.**

## I.    Relevant Procedural History

After the claim's initiation in December 2021, the parties engaged in settlement discussions, but were unable to reach agreement. On March 18, 2024, Respondent filed his Rule 4(c) Report arguing the claim should be dismissed. Rule 4(c) Report (ECF No. 30) at 11-14. I thereafter set deadlines for the filing of briefs addressing both Petitioner's entitlement to compensation and an appropriate damages award. Scheduling Order, filed April 25, 2024 (ECF No. 31).

On July 31, 2024, Petitioner filed a Motion for Ruling on the Record Regarding Entitlement and Damages, arguing that he had established entitlement to compensation for his SIRVA injury, and requesting an award of $160,000.00[3] for past pain and suffering, plus past unreimbursed expenses. Motion for Ruling on the Record (ECF No. 36). Respondent reacted to the filing on September 27, 2024, recommending that entitlement to compensation be denied under the terms of the Vaccine Act. Respondent's Response Brief (ECF No. 38). Respondent further argued that in the event entitlement to compensation was found, Petitioner should be awarded the lesser amount of between $95,000.00 to $125,000.00 for actual pain and suffering. *Id.* at 25-26, 28. Petitioner filed a Reply on December 6, 2024. Petitioner's Reply Brief (ECF No. 40).[4]

Petitioner subsequently filed a Motion for Expedited Resolution of this case, and I scheduled a "Motions' Day" expedited hearing to resolve both entitlement and damages.[5] Petitioner's Motion for Expedited Resolution, filed January 28, 2026 (ECF No. 43); Hearing Order (Non-PDF), filed February 9, 2026. The Motion's Day hearing took place on February 23, 2026. Minute Entry, dated March 26, 2026.[6] After hearing argument, I

---

[3] Petitioner argued at the Motion's Day Hearing that he should be awarded the increased amount of $185,000.00 for pain and suffering. Transcript ("Tr.") filed March 26, 2026 at 24, 36. (ECF No. 48).

[4] Petitioner's Reply brief and simultaneously filed exhibits clarified his request for unreimbursed expenses. Specifically, Petitioner sought $1,350.16 for past unreimbursed expenses, and $82.01 for his payment of his outstanding Medicaid lien. Petitioner's Reply Brief at 20; Exs. 22-23. On February 11, 2026, Respondent filed a Supplemental Brief objecting to reimbursement of Petitioner's past unreimbursable expenses and Medicaid lien. Respondent's Supplemental Brief (ECF No. 44). On February 19, 2026, Petitioner filed a Response to Respondent's Supplemental Brief waiving his requested unreimbursed expenses, but submitting additional evidence regarding his outstanding Medicaid lien. Petitioner's Response to Respondent's Supplemental Brief (ECF No. 46); Ex. 25.

[5] Accordingly, **I hereby find Petitioner's Motion (ECF No. 43) moot.**

[6] Michael Milmoe appeared on behalf of Petitioner, and Nathaniel Trager appeared on behalf of Respondent.

orally ruled on Petitioner's entitlement to compensation, and also made a damages determination. This Decision memorializes those findings.

## II.    Factual Findings and Ruling on Entitlement

### A.  Legal Standards

Before compensation can be awarded under the Vaccine Act, a petitioner must demonstrate, by a preponderance of evidence, all matters required under Section 11(c)(1), including the factual circumstances surrounding his claim. Section 13(a)(1)(A). In making this determination, the special master or court should consider the record as a whole. Section 13(a)(1). Petitioner's allegations must be supported by medical records or by medical opinion. *Id.*

To resolve factual issues, the special master must weigh the evidence presented, which may include contemporaneous medical records and testimony. *See Burns v. Sec'y of Health & Hum. Servs.,* 3 F.3d 415, 417 (Fed. Cir. 1993) (explaining that a special master must decide what weight to give evidence including oral testimony and contemporaneous medical records). Contemporaneous medical records are presumed to be accurate. *See Cucuras v. Sec'y of Health & Hum. Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993). To overcome the presumptive accuracy of medical records, a petitioner may present testimony which is "consistent, clear, cogent, and compelling."  *Sanchez v. Sec'y of Health & Hum. Servs.,* No. 11–685V, 2013 WL 1880825, at *3 (Fed. Cl. Spec. Mstr. Apr. 10, 2013) (citing *Blutstein v. Sec'y of Health & Hum. Servs.,* No. 90–2808V, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998)).

In addition to requirements concerning the vaccination received, the duration and severity of petitioner's injury, and the lack of other award or settlement,[7] a petitioner must establish that she suffered an injury meeting the Table criteria, in which case causation is presumed, or an injury shown to be caused-in-fact by the vaccination she received. Section 11(c)(1)(C).

The most recent version of the Table, which can be found at 42 C.F.R. § 100.3, identifies the vaccines covered under the Program, the corresponding injuries, and the time period in which the particular injuries must occur after vaccination. Section 14(a). Pursuant to the Vaccine Injury Table, a SIRVA is compensable if it manifests within 48

---

[7] In summary, a petitioner must establish that he received a vaccine covered by the Program, administered either in the United States and its territories or in another geographical area but qualifying for a limited exception; suffered the residual effects of his injury for more than six months, died from his injury, or underwent a surgical intervention during an inpatient hospitalization; and has not filed a civil suit or collected an award or settlement for her injury. *See* § 11(c)(1)(A)(B)(D)(E).

hours of the administration of a flu vaccine. 42 C.F. R. § 100.3(a)(XIV)(B). The criteria establishing a SIRVA under the accompanying QAI are as follows:

> Shoulder injury related to vaccine administration (SIRVA). SIRVA manifests as shoulder pain and limited range of motion occurring after the administration of a vaccine intended for intramuscular administration in the upper arm. These symptoms are thought to occur as a result of unintended injection of vaccine antigen or trauma from the needle into and around the underlying bursa of the shoulder resulting in an inflammatory reaction. SIRVA is caused by an injury to the musculoskeletal structures of the shoulder (e.g. tendons, ligaments, bursae, etc.). SIRVA is not a neurological injury and abnormalities on neurological examination or nerve conduction studies (NCS) and/or electromyographic (EMG) studies would not support SIRVA as a diagnosis (even if the condition causing the neurological abnormality is not known). A vaccine recipient shall be considered to have suffered SIRVA if such recipient manifests all of the following:

> (i) No history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection;

> (ii) Pain occurs within the specified time frame;

> (iii) Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and

> (iv) No other condition or abnormality is present that would explain the patient's symptoms (e.g. NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy).

42 C.F.R. § 100.3(c)(10).

### B. Factual Findings

#### 1. Severity

The preliminary issue to be determined in this case is whether Petitioner has satisfied the Vaccine Act's "severity requirement," which requires a claimant to demonstrate that he:

(i) suffered the residual effects or complications of such illness, disability, injury, or condition for more than 6 months after the administration of the vaccine, or (ii) died from the administration of the vaccine, or (iii) suffered such illness, disability, injury or condition from the vaccine which resulted in inpatient hospitalization and surgical intervention.

Section 11(c)(1)(D). To do so here, Petitioner would need to establish sequelae from his alleged SIRVA persisted until at least April 30, 2021 (assuming an onset of October 29, 2020). After a careful review of the record, I find that Petitioner has established that he more likely than not suffered the sequela of his injury for more than six months.

Prior to a five-month treatment gap, Petitioner had a medical visit for his shoulder with a neurologist on February 23, 2020 – nearly four months after the vaccine administration. At that appointment, for his "flu shot reaction," it was noted that he was "doing much better. He [ha]s no new complaints. His arm is back to normal. He is very pleased with how he is doing." Ex. 4 at 4. The neurologist assessed Petitioner with an autoimmune reaction, stating "he had a reaction to the flu[] shot. Based on the EMG this does not appear to be neurologic. It is now resolved. The patient will follow-up as needed." Ex. 4 at 5. At this appointment, Petitioner was also provided prescriptions for prednisone and diclofenac. *Id.*

Petitioner next received shoulder treatment on July 22, 2021, when he was seen by orthopedic surgeon Alexander Martusiewicz, M.D., for "[b]ilateral shoulder pain." Ex. 2 at 148. In his declaration, Petitioner explains that in the time after his neurology visit in February 2020, his shoulder pain continued at "moderate to high levels (4-8)," and he later decided to see an orthopedist. Ex. 8 at 1. At his orthopedic visit, Petitioner reported that he "injured his right shoulder 4 years ago and has had mild pain since that time." Ex. 2 at 148. The record further provides that Petitioner later "developed *left shoulder pain in October 2020 after receiving a flu vaccine*. The shoulder has improved somewhat but is still significant he complains of pain with activities in both arms as well as pain that wakes him up at night. He complains of pain with daily activities." *Id.* (emphasis added).

A physical examination by Dr. Martusiewicz found that Petitioner exhibited forward flexion of 150 degrees and external rotation of 60 degrees in both shoulders. Ex. 2 at 150. Petitioner was assessed with "[b]ilateral shoulder pain with likely left rotator cuff tendinopathy, and chronic right partial thickness rotator cuff tear." *Id.* He received a steroid injection in his *left* shoulder, was advised to continue home exercises, use anti-inflammatories as needed, and follow-up in eight weeks. *Id.* Subsequently, Petitioner continued treatment for his left shoulder with Dr. Martusiewicz, which culminated in left

shoulder surgery on December 8, 2021, followed by three rounds of physical therapy for through September 2022. Ex. 6 at 8; Ex. 5 at 3-48; Ex. 9 at 3-33; Ex. 11 at 38-60.

Respondent correctly points out that Petitioner's injury appeared resolved right before the five-month treatment gap (and short of the six months severity "cut off.") But the focus of the neurologist's inquiry was likely upon any *neurological* injury – which was ruled out by the EMG. Thus, the fact a specialist did not identify a neurologic injury at that time does not rule out the possibility of an ongoing SIRVA.

Additionally, Respondent argues that Petitioner was seen by his primary care provider ("PCP") at various times during the gap - on March 2, May 4, and July 1, 2021 - and there is no mention of shoulder pain in the records corresponding to these visits. *See, e.g.* Ex. 2 at 82-91. However, these visits were not to address Petitioner's shoulder issues. Additionally, while these PCP records reflect that physical examinations were conducted at these visits, no specific examinations of Petitioner's shoulders are described. Ex. 2 at 83, 86, 89-90. Additionally, Petitioner did not report his shoulder pain to his PCP at his first post-vaccination visit on December 10, 2020 – which was for his dyslipidemia and medication refills - suggesting that Petitioner opted instead to address this issue with specialists, like his neurologist or Dr. Martusiewicz. Ex. 2 at 79.

Moreover, I observe (based on my experience adjudicating SIRVA claims) that pain levels in SIRVA cases often fluctuate, and while Petitioner may have felt his arm was significantly better or "back to normal" at his February 23, 2020 appointment, his pain ultimately persisted, as is supported by the medical record of Dr. Martusiewicz five months later. Ex. 2 at 148. (The patient developed *left shoulder pain in October 2020 after receiving a flu vaccine*. The shoulder has improved somewhat but is still significant. . . .") (emphasis added). Dr. Martusiewicz's record is also supported by Petitioner's own declarations, as well as the declarations of his friends Barry Watkins and David Tumbas, as well as his son, Jay Sofen. Exs. 8, 17-20. Finally, I note that there is no evidence for an intervening cause of Petitioner's shoulder pain during his gap in treatment.

Based on the above, I find that Petitioner has established he suffered the sequela of his shoulder injury for more than six months after receipt of the vaccine.

### 2. Onset

The primary Table requirement for SIRVA that Respondent contests is whether Petitioner's first post-vaccination symptom or manifestation of onset (specifically pain) occurred within 48 hours of his vaccination, as set forth in the Vaccine Injury Table and Qualifications and Aids to Interpretation ("QAI") for a Table SIRVA. 42 C.F.R. § 100.3(a)(XIV)(B) (seasonal influenza vaccines); 42 C.F.R. § 100.3(c)(10)(ii) (required

onset for pain listed in the QAI). Based upon a review of the entire record, and for the reasons set forth below, I find that it more likely than not was.

Petitioner received a flu vaccine in his left deltoid on October 29, 2020. Ex. 1 at 1. Petitioner's first medical visit after his vaccination, with his PCP on December 10, 2020, does not document a complaint of left shoulder pain, and states that Petitioner was "doing well." Ex. 2 at 79-80. However, this visit was for Petitioner's dyslipidemia and medical refills. *Id.* While a general physical examination and review of systems is documented, neither was specific to the shoulders. *Id.*

Subsequently, only 18 days later (and two months post-vaccination), on December 28, 2020, Petitioner sought treatment from his neurologist for "a flu shot reaction." Ex. 4 at 6. Petitioner reported he "got a flu[] shot 4-5 weeks ago. *Within a day of getting the shot* he had discomfort in his upper arm." *Id*. (emphasis added). He reported the pain was 3-5/10, and there was "subtle weakness and numbness in the upper arm only." *Id.* The neurologist stated that Petitioner "had a reaction to the flu[] shot," questioned if Petitioner had a brachial plexopathy or not, ordered an EMG, and prescribed a "prednisone for him to take if the pain starts up again." *Id.* at 6-7.

On January 11, 2021, Petitioner had an EMG/NCS of the bilateral upper extremities that was normal. Ex. 4 at 8-13. On January 26, 2021, Petitioner was seen again by the neurologist. *Id*. at 4. The record notes that Petitioner's EMG was normal, and that Petitioner states "his arm is not as sore as it was and is slowly improving. He has been cautious not to use his left arm as much. He does get pain in the left delt/bicep/tricepts. It is intermittent and random. . . . He took a few doses of prednisone and found that his [symptoms] improved." *Id.* On February 23, 2021, Petitioner was seen again by the neurologist for his "flu shot reaction." *Id.* at 4. It was noted that he was "doing much better. He [ha]s no new complaints. His arm is back to normal. He is very pleased with how he is doing." Ex. 4 at 4. The neurologist assessed Petitioner with an autoimmune reaction, stating "he had a reaction to the flu shot. Based on the EMG this does not appear to be neurologic. It is now resolved." *Id.* at 5.

After a five-month gap in his shoulder treatment, Petitioner was by Dr. Martusiewicz for "[b]ilateral shoulder pain." Ex. 2 at 148. The record states that Petitioner "developed left shoulder pain in October 2020 *after receiving a flu vaccine*. The shoulder has improved somewhat but is still significant he complains of pain with activities in both arms as well as pain that wakes him up at night. He complains of pain with daily activities." *Id.* (emphasis added). Thereafter, Petitioner continued to treat for his left shoulder injury.

The medical records cited above, as supported by Petitioner's own sworn declarations, and the declarations of Petitioner's son and friends (Exs. 8, 17-20),

7

preponderately establish that the onset of his shoulder pain likely began within 48 hours of his vaccination. As I have previously observed, "the Vaccine Act clearly does *not* require that symptoms be recorded within a specific timeframe to be preponderantly established. Rather, it requires only that onset *occurs* in the relevant timeframe." *Niemi v. Sec'y of Health & Hum. Servs.,* No. 19-1535V, 2021 WL 4146940, at *4 (Fed. Cl. Aug. 10, 2021) (citing Section 13) (emphasis in original). Neither does the Act require that the medical records document an exact date that the onset of a petitioner's shoulder pain began. A special master may thus find that the first symptom or manifestation of onset of an injury occurred "within the time period described in the Vaccine Injury Table even though the occurrence of such symptom or manifestation was not recorded or was incorrectly recorded as having occurred outside such period." Section 13(b)(2).

### 3.    Limited Range of Motion

Respondent also offered an additional objection to entitlement: that Petitioner cannot establish that he ever suffered the QAI requirement of exhibiting limited range of motion. As an initial matter I observe that I have previously held, after examining 42 C.F.R. § 100.3(c)(10), that the QAI definition for a SIRVA injury requires that a petitioner demonstrate they suffered *both* pain and limited or reduced range of motion following receipt of a covered vaccine. *See Bolick v. Sec'y of Health & Hum. Servs*., No. 20-893V, 2023 WL 8187307, at *7-8 (Fed. Cl. Spec. Mstr. Oct. 19, 2023). However, I have held that there is no associated time requirement required by the Table within which a SIRVA petitioner must manifest reduced range of motion, or how much such limitations must be established. *Id; see also Dawson v. Sec'y of Health & Hum. Servs*., No. 19-278V, 2021 WL 5774655, at *4 (Fed. Cl. Spec. Mstr. Nov. 4, 2021)("no time period is set forth in which Petitioner must manifest reduced range of motion").

In the instant case, the record contains sufficient evidence that Petitioner suffered limited range of motion to find this element satisfied. The first objective evidence that Petitioner suffered limited range of motion occurred approximately nine months after his vaccination - at his July 22, 2021 examination by Dr. Martusiewicz. At that time, measuring Petitioner's range of motion in both shoulders was documented (Petitioner had a separate and long-standing right shoulder injury) as follows: forward flexion of 150 degrees, external rotation of 60 degrees, internal rotation to T12.[8]  Ex. 2 at 150. As I have found in other cases, normal shoulder range of motion for adults ranges from 165 to 180 degrees in flexion, 170 to 180 degrees in abduction, 90 to 100 degrees in external rotation, and 70 to 90 degrees in internal rotation. CYNTHIA C. NORKIN & D. JOYCE WHITE, MEASUREMENT OF JOINT MOTION: A GUIDE TO GONIOMETRY 72, 80, 84, 88 (F. A. Davis Co., 5th ed. 2016); *Stamm v. Sec'y of Health & Hum. Servs*., No. 20-

---

[8] I also observe that this is the first time one of Petitioner's medical providers documented his range of motion in the record.

1590V, 2024 WL 4678224, at *5 (Fed. Cl. Spec. Mstr. Oct. 1, 2024) (applying normal range of motion measurements in another SIRVA claim as described in the text above). Accordingly, Petitioner objectively exhibited reduced range of motion in his left shoulder.

Respondent argues that even if I find that Petitioner suffered the sequela of his injury for more than six months, he still has failed to demonstrate that his shoulder range of motion in July 2021 was abnormal for someone in his age group, and points out that Petitioner's MRI demonstrated severe degenerative changes. Respondent's Response Brief at 19. However, the Vaccine Injury Table contains no instruction regarding what measurement specifically constitutes reduced range of motion – nor provides any age or other qualifiers to determine whether a petitioner has demonstrated reduced range of motion. At bottom, this claim element is not particularly difficult to meet, so long as there is *some* objective record evidence of an affirmative finding of reduced ROM (as opposed to *pain* on shoulder motion that causes a claimant to hesitate to move their shoulder).

Accordingly, I find that Petitioner demonstrated reduced range of motion in his left shoulder and thus satisfied the third QAI requirement for a SIRVA Table injury. 42 C.F.R. § 100.3(c)(10)(iii).

### C.  Other Requirements for Entitlement

Based on the above, Petitioner has satisfied all requirements for a Table SIRVA. However, even if a petitioner has satisfied the requirements of a Table injury or established causation-in-fact, he or she must also provide preponderant evidence of the additional requirements of Section 11(c), *i.e.,* receipt of a covered vaccine, etc. *See generally* § 11(c)(1)(A)(B)(D)(E). But those elements are established or undisputed in this claim. I therefore find that Petitioner is entitled to compensation in this case.

### III.    Damages

### A.  Legal Standards for Damages Awards

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4). Additionally, a petitioner may recover "actual unreimbursable expenses incurred before the date of judgment award such expenses which (i) resulted from the vaccine-related injury for which petitioner seeks compensation, (ii) were incurred by or on behalf of the person who suffered such injury, and (iii) were for diagnosis, medical or other remedial care, rehabilitation . . . determined to be reasonably necessary." Section 15(a)(1)(B). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health &*

9

*Hum. Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

There is no mathematic formula for assigning a monetary value to a person's pain and suffering and emotional distress. *I.D. v. Sec'y of Health & Hum. Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("[a]wards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula"); *Stansfield v. Sec'y of Health & Hum. Servs.*, No. 93-0172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("the assessment of pain and suffering is inherently a subjective evaluation"). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *I.D.*, 2013 WL 2448125, at *9 (quoting *McAllister v. Sec'y of Health & Hum. Servs.*, No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

I may also consider prior pain and suffering awards to aid my resolution of the appropriate amount of compensation for pain and suffering in this case. *See, e.g.*, *Doe 34 v. Sec'y of Health & Hum. Servs.*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case."). And, of course, I may rely on my own experience (along with my predecessor Chief Special Masters) adjudicating similar claims. *Hodges v. Sec'y of Health & Hum. Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated the special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims).

Although pain and suffering in the past was often determined based on a continuum, as Respondent argues, that practice was cast into doubt by a Court of Federal Claims decision several years ago. *Graves v. Sec'y of Health & Hum. Servs.*, 109 Fed. Cl. 579 (Fed. Cl. 2013). *Graves* maintained that to do so resulted in "the forcing of all suffering awards into a global comparative scale in which the individual petitioner's suffering is compared to the most extreme cases and reduced accordingly." *Id.* at 590. Instead, *Graves* assessed pain and suffering by looking to the record evidence, prior pain and suffering awards within the Vaccine Program, and a survey of similar injury claims outside of the Vaccine Program. *Id.* at 595. Under this approach, the statutory cap merely cuts off *higher* pain and suffering awards – it does not shrink the magnitude of *all* possible awards as falling within a spectrum that ends at the cap. Although *Graves* is not controlling of the outcome in this case, it provides reasoned guidance in calculating pain and suffering awards – and properly emphasizes the importance in each case of basing damages on the specific injured party's circumstances.

### B.  Prior SIRVA Compensation Within SPU[9]

### 1.  Data Regarding Compensation in SPU SIRVA Cases

SIRVA cases have an extensive history of informal resolution within the SPU. As of January 1, 2026, 5,397 SPU SIRVA cases have resolved since the inception of SPU more than ten years before. Compensation has been awarded in the vast majority of cases (5,194), with the remaining 203 cases dismissed.

2,946 of the compensated SPU SIRVA cases were the result of a ruling that the petitioner was entitled to compensation (as opposed to an informal settlement), and therefore reflect full compensation.[10] In only 351 of these cases, however, was the amount of damages determined by a special master in a reasoned decision or ruling.[11] As I have previously stated, the written decisions setting forth such determinations, prepared by neutral judicial officers (the special masters themselves), provide the most reliable guidance in deciding what similarly-situated claimants should also receive.[12]

The data for all categories of damages decisions described above reflect the expected differences in outcome, summarized as follows:

---

[9] All figures included in this decision are derived from a review of the decisions awarding compensation within the SPU. All decisions reviewed are, or will be, available publicly. All figures and calculations cited are approximate.

[10] The remaining 2,248 compensated SIRVA cases were resolved via stipulated agreement of the parties without a prior ruling on entitlement. These agreements are often described as "litigative risk" settlements, and thus represent a reduced percentage of the compensation which otherwise would be awarded. Because multiple competing factors may cause the parties to settle a case (with some having little to do with the merits of an underlying claim), these awards from settled cases do not constitute a reliable gauge of the appropriate amount of compensation to be awarded in other SPU SIRVA cases.

[11] The rest of these cases resulting in damages after concession were either reflective of a proffer by Respondent (2,561 cases) or stipulation (34 cases). Although all proposed amounts denote *some* form of agreement reached by the parties, those presented by stipulation derive more from compromise than instances in which Respondent formally acknowledges that the settlement sum itself is a fair measure of damages.

[12] Of course, even though *all* independently-settled damages issues (whether by stipulation/settlement or proffer) must still be approved by a special master, such determinations do not provide the same judicial guidance or insight obtained from a reasoned decision. But given the aggregate number of such cases, these determinations nevertheless "provide *some* evidence of the kinds of awards received overall in comparable cases." *Sakovits v. Sec'y of Health & Hum. Servs.*, No. 17-1028V, 2020 WL 3729420, at *4 (Fed. Cl. Spec. Mstr. June 4, 2020) (discussing the difference between cases in which damages are agreed upon by the parties and cases in which damages are determined by a special master).

|  | Damages Decisions by Special Master | Proffered Damages | Stipulated Damages | Stipulated[13] Agreement |
|---|---|---|---|---|
| **Total Cases** | *352* | *2,560* | *34* | *2,248* |
| **Lowest** | $25,000.00 | $4,000.00 | $37,013.60 | $1,000.00 |
| **1st Quartile** | $66,994.13 | $58,000.79 | $87,750.00 | $30,000.00 |
| **Median** | **$91,163.89** | **$77,500.00** | **$112,119.37** | **$47,951.60** |
| **3rd Quartile** | $125,000.00 | $105,276.51 | $160,376.79 | $73,477.50 |
| **Largest** | $1,569,302.82 | $1,845,047.00 | $1,500,000.00 | $550,000.00 |

## 2. Pain and Suffering Awards in Reasoned Decisions

In the 352 SPU SIRVA cases in which damages were determined via reasoned decision or ruling, compensation for a petitioner's actual or past pain and suffering varied from $25,000.00 to $215,000.00, with $89,500.00 as the median amount. Only ten of these cases involved an award for future pain and suffering, with yearly awards ranging from $250.00 to $1,500.00.[14] In one of these cases, the future pain and suffering award was limited by the statutory pain and suffering cap.[15]

In cases with lower awards for past pain and suffering, many petitioners commonly demonstrated only mild to moderate levels of pain throughout their injury course. This lack of significant pain is often evidenced by a delay in seeking treatment – over six months in one case. In cases with more significant initial pain, petitioners usually experienced this greater pain for three months or less. Most petitioners displayed only mild to moderate limitations in range of motion ("ROM"), and MRI imaging showed evidence of mild to moderate pathologies such as tendinosis, bursitis, or edema. Many petitioners suffered from unrelated conditions to which a portion of their pain and suffering could be attributed. These SIRVAs usually resolved after one to two cortisone injections and two months or less of physical therapy ("PT"). None required surgery. Except in one

---

[13] Two awards were for an annuity only, the exact amounts which were not determined at the time of judgment.

[14] Additionally, a first-year future pain and suffering award of $10,000.00 was made in one case. *Dhanoa v. Sec'y of Health & Hum. Servs.*, No. 15-1011V, 2018 WL 1221922 (Fed. Cl. Spec. Mstr. Feb. 1, 2018).

[15] *Joyce v. Sec'y of Health & Hum. Servs.*, No. 20-1882V, 2024 WL 1235409, at *2 (Fed. Cl. Spec. Mstr. Feb. 20, 2024) (applying the $250,000.00 statutory cap for actual and future pain and suffering set forth in Section 15(a)(4) before reducing the future award to net present value as required by Section 15(f)(4)(A)); *see Youngblood v. Sec'y of Health & Hum. Servs.*, 32 F.3d 552, 554-55 (Fed. Cir.1994) (requiring the application of the statutory cap before any projected pain and suffering award is reduced to net present value).

case involving very mild pain levels, the duration of the SIRVA injury ranged from six to 30 months, with most petitioners averaging approximately nine months of pain. Although some petitioners asserted residual pain, the prognosis in these cases was positive.

Cases with higher awards for past pain and suffering involved petitioners who suffered more significant levels of pain and SIRVAs of longer duration. Most of these petitioners subjectively rated their pain within the upper half of a ten-point pain scale and sought treatment of their SIRVAs more immediately, often within 30 days of vaccination. All experienced moderate to severe limitations in range of motion. MRI imaging showed more significant findings, with the majority showing evidence of partial tearing. Surgery or significant conservative treatment, up to 133 PT sessions - occasionally spanning several years, and multiple cortisone injections, were required in these cases. In nine cases, petitioners provided sufficient evidence of permanent injuries to warrant yearly compensation for future or projected pain and suffering.

### 3. Appropriate Compensation for Pain and Suffering

In this case, awareness of the injury is not disputed. The record reflects that at all times Petitioner was a competent adult with no impairments that would impact his awareness of his injury. Therefore, I analyze principally the severity and duration of Petitioner's injury. In determining appropriate compensation for pain and suffering, I have carefully reviewed and taken into account the complete record in this case, including, but not limited to: Petitioner's medical records, sworn statements, filings, and all assertions made by the parties in written documents and at the expedited hearing held on February 23, 2026. I have also considered prior awards for pain and suffering in both SPU and non-SPU SIRVA cases, and relied upon my experience adjudicating these cases. However, my determination is ultimately based upon the specific circumstances of this case.

One factor immediately relevant to my determination is Petitioner's initial gap in treatment during the first six months following his vaccination. Petitioner alleges that after he last saw his neurologist (nearly four months post vaccination), his shoulder pain continued at "moderate to high levels (4-8)." Ex. 8 at 1. Yet, he waited five months to seek further care. While I find that such a gap in treatment does not mean that Petitioner's shoulder pain did not persist (and was therefore not grounds for denial of entitlement), the delay in seeking further treatment supports the conclusion that Petitioner's shoulder pain was not so severe as to necessitate urgent treatment, and that he was able to manage his shoulder pain during this time period.

13

Thereafter, Petitioner sought care from orthopedic surgeon Dr. Martusiewicz for four a-half months (undergoing a steroid injection[16] and an MRI[17]) before electing to have shoulder surgery on December 8, 2021.[18] After undergoing his shoulder surgery, Petitioner engaged in an initial 24 post-operative physical therapy sessions from February 1, 2022 through May 5, 2022. Ex. 5 at 3-48; Ex. 9 at 3-33. However, after his discharge from physical therapy, Petitioner reported that his left shoulder pain persisted, and after reviewing an updated MRI conducted on July 20, 2022,[19] Dr. Martusiewicz referred Petitioner to a physical medicine and rehabilitative ("PMR") specialist. Ex. 13 at 24.

That PMR treater, Jose L. Mendez, M.D., noted that Petitioner reported only a "slight improvement" since his surgery, and daily pain. Ex. 10 at 35. Dr. Mendez assessed Petitioner with chronic left shoulder pain and referred Petitioner for additional physical therapy. *Id*. at 39. Petitioner completed an additional nine physical therapy visits for his shoulder pain between August 11, 2022 and September 9, 2022. Ex. 11 at 38-60. Petitioner was seen for a follow-up PMR visit on November 16, 2022. Ex. 10 at 19.

---

[16] Petitioner received a steroid injection in the left shoulder at this initial appointment with Dr. Martusiewicz on July 22, 2021. Ex. 2 at 150.

[17] During this time, Petitioner underwent an left shoulder MRI on October 16, 2021 which  indicated:

> [1.] Tendinopathy involving the subscapularis tendon. Biceps tendon is intact.
> [2.] Tendinopathy changes involving the anterior and mid fibers of the
> supraspinatus tendon. Posterior fibers and infraspinatus fibers are
> normal. No tear identified.
> [3.] Severe degenerative changes of the AC joint with impingement.
> [4.] No joint effusion. No bone marrow edema.
> [5.] Tear of the middle glenohumeral ligament.

Ex. 7 at 1. The impression was [t]endinopathy changes of the subscapularis and supraspinatus tendons. No tear identified". *Id.*

[18] On December 8, 2021, Petitioner underwent general anesthesia for the following surgical procedures: Left shoulder arthroscopy with subacromial decompression, open bicep tenodesis, and rotator cuff repair. Ex. 6 at 8. Petitioner's pre and post operative diagnoses were: Left shoulder bursitis, bicep tendonitis, partial cuff tear. *Id.* Finally, the "Indication for Procedure" was "[l]eft shoulder bursitis, near full thickness rotator cuff tear and biceps tendonitis refractory to conservative care. Onset [status post] vaccination in shoulder without resolution." *Id.*

[19] Petitioner's July 20, 2022 MRI impression included:

> 1. No evidence of recurrent or retracted tear. Rotator cuff anchors in place
> in the greater tuberosity. Mild distention of the subdeltoid bursa. Correlate
> for subdeltoid bursitis.
> 2. Circumferential tear of the labrum.
> 3. Absent biceps tendon. Correlate for full-thickness tear versus tenodesis.
> 4. Moderate AC joint arthrosis with undersurface spurring.

Ex. 12 at 4-5
.

Petitioner reported at this appointment that he was "95% better", and that his pain ranged from 0-4/10. *Id.* at 19. The assessment remained chronic left shoulder pain. *Id.* at 23.

Subsequently, there are additional gaps in Petitioner's treatment for his left shoulder during 2023 and 2024.[20] Additionally, during this time Petitioner sought medical care for multiple unrelated conditions in *addition* to his left shoulder, including bilateral leg pain, right elbow pain, left elbow pain, and lateral epicondylitis of the left elbow, in addition to his chronic left shoulder pain. *See, e.g.*, Ex. 11 at 3-28; Ex. 14 at 1; Ex. 15 at 49-50. While it is difficult to attribute how much of Petitioner's reported left shoulder symptoms in 2023 and 2024 are related to his SIRVA, this record establishes that it is likely Petitioner continued to experience some SIRVA sequelae during this time period. However, I do not find that Petitioner has established that his left elbow symptoms (which culminated in elbow surgery on May 1, 2024) are related to his SIRVA. Ex. 16 at 54.

In making my determination, I have also fully considered Petitioner's sworn statements and those of his son and friends. Exs. 8, 17-20. I acknowledge that Petitioner's injury caused him to suffer pain (both mental and physical) for multiple years – although as he admits, that pain waxed and wanted over time. I also recognize that Petitioner's mental anguish was particularly significant given his history of anxiety and depression. *See, e.g.*, Ex. 10 at 20; Ex. 8.  Additionally, I have given weight to Petitioner's pain journal entries, where he reports his subjective pain measurements for both his left shoulder, and other injuries, from his surgery on December 8, 2021 through August 11, 2024. Ex. 21.

Petitioner argued in his briefs, and at the hearing in this case, that his case is comparable to the following cases: *Reed v. Sec'y of Health & Hum. Servs.,* No. 16-1670, 2019 WL 1222925 (Fed. Cl. Spec. Mstr. Feb. 1, 2019*)* (awarding $160,000.00 in pain and suffering awarded by another special master); *Reynolds v. Sec'y of Health & Hum. Servs.*, No. 20-0294V, 2022 WL 17819545 (Fed. Cl. Spec. Mstr. Nov. 7, 2022) (awarding $150,000.00 pain and suffering); *Schoonover v. Sec'y of Health & Hum. Servs.,* No. 16-1324V, 2020 WL 5351341 (Fed. Cl. Spec. Mstr. Aug. 5, 2020) ($200,000.00 pain and suffering, plus $39,600.00 in future pain and suffering, awarded by another special

---

[20] During this time period, Petitioner underwent a left shoulder ultrasound on February 19, 2024, the impression of which included:

> 1. Tendinosis of the long head biceps tendon with postsurgical tenodesis changes.
> 2. Supraspinatus tendinosis with postsurgical changes in low-grade partial-thickness articular surface tear without evidence of full-thickness retracted tear.
> 3. Subscapularis tendinosis.
> 4. Intrasubstance tear of the visualized posterior labrum.

Ex. 15 at 38.

master); *Hooper v. Sec'y of Health & Hum. Servs.,* No. 17-12V, 2019 WL 1561519 (Fed. Cl. Spec. Mstr. Mar. 20, 2019) ($185,000.00 pain and suffering plus a future pain and suffering awarded by another special master); *Lawson v. Sec'y of Health & Hum. Servs.,* No. 18-882V, 2021 WL 688560 (Fed. Cl. Spec. Mstr. Jan. 5, 2021) (awarding $205,000.00 pain and suffering in three surgery SIRVA case). However, I find these cases represent more severe injuries than suffered by Petitioner. Particularly inapposite the instant claim are *Hooper* (involving a SIRVA injury so severe a future award was warranted), *Schoonover* (which involved both a future damages award and two shoulder surgeries), and *Lawson* (a SIRVA claim involving three shoulder surgeries and seven steroid injections).

Respondent, by contrast, offers comparable decisions representing cases where the injuries suffered were not quite as severe as that suffered by Petitioner herein, including: *Hunt v. Sec'y of Health & Hum. Servs.,* No. 19-1003V, 2022 WL 2826662 (Fed. Cl. Spec. Mstr. June 16, 2022) (awarding $95,000.00 pain and suffering); *Shelton v. Sec'y of Health & Hum. Servs.*, No. 19-0279V, 2021 WL 2550093 (Fed. Cl. Spec. Mstr. May 21, 2021) (awarding $97,500.00 pain and suffering); *Crawford v. Sec'y of Health & Hum. Servs.*, No. 19-0544V, 2024 WL 1045147 (Fed. Cl. Spec. Mstr. Feb. 5, 2024) (awarding $105,000.00 in actual pain and suffering); *Gray v. Sec'y of Health & Hum. Servs.*, No. 20-1708V, 2022 WL 6957013 (Fed. Cl. Spec. Mstr. Sept. 12, 2022) (awarding $110,000.00 pain and suffering); and *Meyers v. Sec'y of Health & Hum. Servs.*, No. 20-0779V, 2024 WL 706877 (Fed. Cl. Spec. Mstr. Jan. 12, 2024)(awarding $125,000.00 pain and suffering).

I find that the best comparable case offered by either party was *Crawford*. *Crawford*, 2024 WL 1045147. Although there are individual distinguishing factors, both Mr. Sofen and the *Crawford* petitioner experienced gaps during which they either did not receive shoulder treatment, or such treatment was "limited in scope," but on balance "endured a fairly long treatment course." *Id.* at *25. Nonetheless, I find Petitioner's injury herein warrants a higher award of pain and suffering as the initial delay before first seeking care was longer in the *Crawford* claim (four months before reporting shoulder pain versus two months by Petitioner herein). In addition, Petitioner herein maintained a detailed pain journal evidencing his pain levels post-surgery, and Petitioner experienced unique mental anguish given his mental health-related medical history.

Accordingly, **I find that $135,000.00 represents a fair and appropriate amount of compensation for Petitioner's past or actual pain and suffering.**

### 4. Appropriate Compensation for Unreimbursed Expenses

Petitioner has waived his previously sought unreimbursed expenses, *except* for a Medicaid lien that totals $82.01. ECF No. 46. Petitioner has submitted documentation that this amount is related to his left shoulder pain (and specifically his January 10, 2024 medical visit which included a diagnosis of "[p]ain in left shoulder"). Ex. 25.[21] As I discussed above and at the hearing in this matter, it is difficult to parse out how exactly much of Petitioner's left shoulder symptoms remained attributable to his SIRVA in 2023 and 2024. But I have found (as discussed above) that at least some of Petitioner's left shoulder sequela is related to his SIRVA. In particular, in finding this amount compensable, I note that Petitioner's Medicaid lien documentation provides a "D/I: 10/29/2020" – the date of Petitioner's vaccination. Ex. 23 at 2. Accordingly, I find that Petitioner should be awarded $82.01 in reimbursement for his Medicaid lien.

### Conclusion

For all of the reasons discussed above and based on consideration of the record as a whole, **I award the following compensation:**

1.  **A lump sum payment of $135,000.00 (representing pain and suffering) to be paid through an ACH deposit to Petitioner's counsel's IOLTA account for prompt disbursement; and**

2.  **A lump sum payment of $82.01, representing compensation for the State of Michigan Medicaid lien, to be paid through an ACH deposit to Petitioner's counsel's IOLTA account for prompt disbursement to:**

**Michigan Department of Health and Human Services**
**Third Party Liability Division**
**P.O. Box 30053**
**Lansing, MI  48909**

This amount represents compensation for all damages that would be available under Section 15(a).[22]

---

[21] At the expedited hearing, Respondent deferred to me regarding whether Petitioner should be awarded the requested Medicaid lien reimbursement in this claim. Tr. at 11.

[22] Since this amount is being awarded for actual, rather than projected, pain and suffering, no reduction to net present value is required. *See* Section 15(f)(4)(A); *Childers v. Sec'y of Health & Hum. Servs.*, No. 96-0194V, 1999 WL 159844, at *1 (Fed. Cl. Spec. Mstr. Mar. 5, 1999) (citing *Youngblood v. Sec'y of Health & Hum. Servs.*, 32 F.3d 552 (Fed. Cir. 1994)).

The Clerk of Court is directed to enter judgment in accordance with this Decision.[23]


**IT IS SO ORDERED.**

<u>**s/Brian H. Corcoran**</u>
Brian H. Corcoran
Chief Special Master

---

[23] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.